## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **TIMOTHY J. PETERSON,** | **REPORT AND RECOMMENDATION** |
| **Plaintiff,** | |
| | **Case No. 2:16-cv-00775-RJS-PMW** |
| **v.** | |
| **IAN ADAMS, in an individual and official capacity; DOUG DIAMOND, in an official capacity; WEST JORDAN CITY; SALT LAKE COUNTY; JAMES "JIM" WINDER, in an individual and official capacity; and JOHN AND/OR JANE DOES 1-20,** | **District Judge Robert J. Shelby** |
| | **Chief Magistrate Judge Paul M. Warner** |
| **Defendants.** | |

District Judge Robert J. Shelby referred this case to Chief Magistrate Judge Paul M. Warner pursuant to 28 U.S.C. § 636(b)(1)(B).[1]  Before the court are (1) defendants Doug Diamond ("Chief Diamond") and West Jordan City's (the "City") (collectively, the "West Jordan Defendants") motion for summary judgment;[2] (2) Salt Lake County (the "County") and James Winder's ("Sherriff Winder") (collectively, the "County Defendants") motion for summary judgment;[3] and, (3) Ian Adams' ("Officer Adams") motion for summary judgment.[4] Plaintiff

---

[1] *See* docket no. 98.

[2] *See* docket no. 105.

[3] *See* docket no. 108.

[4] *See* docket no. 111.

Timothy J. Peterson ("Plaintiff" or "Peterson") has not responded to any of the three motions for summary judgment. The court has carefully reviewed the written memoranda submitted by the parties.  Pursuant to civil rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the court has concluded that oral argument is not necessary and will determine the motions on the basis of the written memoranda.  *See* DUCivR 7-1(f).

## RELEVANT BACKGROUND

This case arises out of Peterson's arrest in July 2014, and medical treatment following arrest. In the early morning hours of July 10, 2014, Peterson was involved in an altercation with Officer Adams which resulted in Peterson being shot twice in the buttocks and hip (the "Shooting Incident"). Peterson was treated on the scene by Emergency Medical Services and transported under police guard to the Intermountain Medical Center ("IMC") emergency where he was treated for non-life-threatening gunshot wounds. Peterson was arrested and charged by the Salt Lake County District Attorney's Office (the "District Attorney's Office") with assault against a police officer; purchase, transfer, possession or use of a dangerous weapon by restricted person; and failure to stop at command of law officer. After he spent four days at IMC, he was transported to the Salt Lake County Adult Detention Center ("Jail") under police guard. Peterson was placed in the Jail's Acute Medical Unit, where he spent an additional ten days recovering. Once Peterson was discharged into the Jail's general population, Peterson submitted several sick call requests during his incarceration, all of which received response. The District Attorney's Office prosecuted Peterson for assault against a police officer, and successfully established probable cause for the charge at a preliminary hearing. Peterson was eventually tried on the

charge of assault against a police officer and acquitted by a jury. Peterson spent approximately nineteen months in Jail before his acquittal.

Following his acquittal, Plaintiff filed the complaint in the instant case. Peterson's amended complaint ("Complaint") alleges several causes of action against the various defendants for alleged deprivation of his constitutional rights in violation of 42 U.S.C. § 1983. First, against Officer Adams, Plaintiff brings claims for (1) excessive force, (2) malicious prosecution, and (3) false arrest.[5] Plaintiff brings claims against the West Jordan Defendants for (1) excessive force, (2) policy and custom, (3) malicious prosecution, and (4) false arrest. Finally, Plaintiff brings claims against the County Defendants for (1) failure to provide adequate medical care, (2) failure to provide adequate medical care – policy and custom, and (3) malicious prosecution.

## RELEVANT UNDISPUTED FACTS

Because Plaintiff did not respond to any of the motions for summary judgment, the court treats all of the facts set forth in the motions as undisputed for purposes of the motions. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]"). The following undisputed facts are taken from defendants' motions for summary judgment, and are supported by evidence as cited in the motions.[6]

---

[5] *See* docket no. 54 at 8-10, and 14-17.

[6] The facts set forth in paragraphs 1 through 81 are taken from Officer Adams' motion for summary judgment (docket no. 108) and are identical to those set forth in paragraphs 1 through 81 of the West Jordan Defendants' motion for summary judgment (docket no. 105). The facts set forth in paragraphs 82 through 106 are taken from the undisputed facts set forth in paragraphs 1 through 25 of County Defendants' motion for summary judgment (docket no. 108). The facts set

**Protective Order and Warrants.**

1.      Based upon repeated instances of domestic violence, Peterson's spouse (Stacie Peterson) sought and was granted a protective order in February 2014.

2.      On or about July 5, 2014, Peterson repeatedly called Stacie Peterson demanding that she meet him, in violation of the protective order.

3.      After Stacie Peterson refused to meet Peterson, he continued to make disturbing and harassing visits to Stacie Peterson's home, including ringing the doorbell after midnight, prompting Stacie Peterson to report Peterson's actions to the police.

4.      In early July 2014, at the time of the subject incident, Plaintiff had multiple warrants for his arrest for DUI, disorderly conduct, use or possession of drug paraphernalia and traffic control violations.

5.      On the night of July 9, 2014, Peterson was aware that if a police officer stopped him that they had the right to arrest Peterson because of the outstanding warrants.

**Facebook and Anonymous Tipster.**

6.      In the months leading up to July 2014, Peterson maintained a Facebook social media account.

7.      On July 7, 2014, an anonymous tipster[7] contacted the West Jordan Police Department, stating that Peterson was posting messages on Facebook that he was upset with

---

forth in paragraphs 26 through 29 of the County Defendants' motion for summary judgment are redundant of facts set forth in Officer Adams' and the West Jordan Defendants' motions for summary judgment.

[7] The identity of the tipster is known to counsel and is the subject of a protective order for "Attorneys Eyes Only."

Stacie for calling the police and was going to shoot at cops if they come to his location. The tipster was also concerned that Stacie Peterson might also be in trouble because Peterson posted a message on Facebook that he was possibly in the Jordan Landing area, near a Walmart and had a pistol on him.

8.      The tipster emailed screenshots of three of Peterson's Facebook posts, along with his Facebook profile picture, to Officer Kiesel.

9.      In July 2014, prior to the subject incident, Plaintiff posted the following on Facebook, a screenshot of which was sent to Officer Kiesel, "Read my things at least why I'm going to shoot the cops if they come honest truth ill pay for a lie detector test right now i swear to god i will."

10.     In July 2014, prior to the subject incident, Peterson posted the following on Facebook, a screenshot of which was sent to Officer Kiesel, "i mean shit i told her tell the cops i got a pistol were fucking getting it on when they try to roke me. i have nothing to loose anymore i went out last night hoping for them to pull ilon me. and i will today again to cause I'm done with this not a single person i know has a heart like they should and that's fine atleast i know i died with dignity and knew i was a gold person a lot of you think you are but your not . . . don't matter when i get shot by tbe cops it dobt matter cause i love her and I'll never give up her . . . ."

11.     In July 2014, prior to the subject incident, Peterson posted the following on Facebook, a screenshot of which was sent to Officer Kiesel, ". . . stacies dumb littke finger she loves to use so much to call the cops with finally got reall fuckung old anyone else id fuckun kill

them but she gets a pass cause she my girl i don't hate ya sweetheart still live ya but you know this one is your fault yours."

12.     Peterson admits that he threatened to kill police officers in his social media posts.

**Attempt to Locate and Briefings.**

13.     On July 8, 2014, officers at West Jordan Police Department ran a search for all outstanding warrants for Timothy J. Peterson and found outstanding warrants for DUI and Use or Possession of Drug Paraphernalia, warrant #1793401, issued July 8, 2014; Use or Possession of Drug Paraphernalia and Disorderly Conduct, warrant #1791271, issued July 8, 2014; and Traffic Control Signal Violations, warrant #1380741, issued April 10, 2014.

14.     As a result of the information provided to Officer Kiesel by the tipster, an ATL (Attempt to Locate) was placed out for Timothy Peterson in reference to the existing incident report[8] as well as the new information that he could possibly be armed.

15.     At the time the ATL was issued, the profile picture of Peterson, along with his Facebook posts were displayed in the briefing rooms at the West Jordan Police Department as "a warning for the officers on – or patrolling West Jordan to be on – to be vigilant or look out."

16.     On July 8 and 9, 2014, officers coming on shift discussed Peterson in their pre-shift briefings, where Peterson's Facebook posts and profile picture were discussed and presented.

---

[8] The information from the Tipster was included in the existing incident report, #14H009151, associated with Peterson's violation of the Protective Order.

6

17.     On July 9, 2014, at the beginning of their shift, Officer Adams "mentioned to the rest of the team that if we didn't have anything going on – because I think Hercules had said his interactions occurred pretty late at night, like 11:00 to 1:00 . . . . And I had mentioned that if we had a slow shift that we ought to kind of flood that area with our available manpower and see if we could pick him up."

18.     On July 8 or 9, 2014, Officer Vargas of the West Jordan Police Department informed West Jordan police officers, including Officer Adams, of Plaintiff's threats to kill officers, that Peterson was wanted pursuant to an open West Jordan Police file, that Peterson had violated a protective order, and that Peterson had several outstanding warrants.

19.     During those pre-shift briefings, Officer Adams also learned that Peterson was posting on social media that Peterson had a gun in the Jordan Landing area and that Peterson remained at-large.

20.     Officer Adams also learned that Peterson "was threatening to kill police and that he was in the possession of a gun and that he was serious, didn't want to go to jail or something."

21.     Based on the information from the pre-shift briefings, Officer Adams suggested that if it was a slow shift that the officers should go to the Jordan Landing area around 11:00 p.m. to 2:00 a.m., which was the time discussed as when prior interactions with Peterson occurred, to try to pick up Peterson on the outstanding warrants.

22.     Officer Adams and the West Jordan Police Department had probable cause to arrest Peterson on the outstanding warrants

**Peterson's Actions on July 9, 2014.**

23.     Earlier in the day on July 9, 2014, Peterson and a friend, Dustin Tippie, purchased heroin and cocaine, of which Peterson took "two hits of heroin" and "one hit of the coke" around noon. Peterson states that the effects of these drugs only lasts 20 minutes.

24.     Immediately following their drug use, Tippie and Peterson then drove to Peterson's father's house.

25.     Later that evening, around 5:30 or 6:00 p.m., Tippie and Peterson purchase a six-pack of 16-ounce cans of beer, of which Peterson drank 2-3 beers.

26.     After drinking, Peterson and Tippie went to the Walmart at Jordan's Landing, where Peterson goes every night to "buy me a couple tall cans and go sit and watch cars go by."

27.     Peterson took with him, and carried in his pocket a "big old butcher knife" in a red sheath in his front pocket, a sharpened letter opener that has the appearance of a knife in his left pocket, a bent piece of metal in the shape of a pistol with the laser pointer attached also in his left pocket, and a pair of scissors.

28.     Peterson was carrying the knife and scissors admittedly as weapons.

29.     Before going into Walmart, Peterson removed the butcher knife from his pocket and hid it in a bush, but kept the sharpened letter opener and bent piece of metal on his person. Peterson was concerned the butcher knife would fall out in the store.

**Officer Adams' Interactions with Peterson on July 10, 2014.**

30.     During the early morning hours of July 10, 2014, Officer Adams saw Peterson and another individual Tippie walking in the Jordan Landing area of West Jordan, Utah. Officer Adams recognized Peterson from the photograph in the West Jordan Police Department.

31.     After turning around, Officer Adams pulled his vehicle up to Peterson and the other individual and stopped six to eight feet away. Peterson stopped as Officer Adams pulled up beside Peterson. From the inside of the police vehicle, Officer Adams visually confirms Peterson's identity and says, "Hey, Tim."

32.     Peterson recognized the individual and vehicle as a West Jordan City police officer.

33.     As Officer Adams approached Peterson and the other individual, Officer Adams was aware of the prior threats made by Peterson.

34.     Peterson did not immediately turn to face Officer Adams. Upon being asked "Hey, Tim," Peterson turned and responded "I'm not Tim." The other individual did not respond although Officer Adams had addressed both individuals. Peterson then said his name was "Mike" in a manner that illustrated to Officer Adams that Peterson was lying.

35.     After lying to Officer Adams and providing the wrong name, Peterson and the other individual began slowly walking away from the vehicle as Officer Adams says, "Okay, well, let me talk to you," and the individuals continued to walk. Officer Adams pulled ahead of them and put his patrol vehicle in Park.

36.     During this time, Officer Adams was uncomfortable as he was speaking to Peterson while seated in his patrol vehicle through the passenger side window, where Peterson could have presented a threat.

37.     Based on prior information from the pre-shift briefing, Officer Adams was aware that Peterson had said he had a pistol and had made threats to harm police officers.

38.     As Officer Adams exited his patrol vehicle and began to approach Peterson, Peterson began running in the direction away from Officer Adams with his left shoulder facing Officer Adams.

39.     Peterson admits that after lying to Officer Adams, he began to walk faster in the direction away from Officer Adams and "bolted" when he saw Adams exit his patrol vehicle.

40.     Prior to beginning to run, Officer Adams observed Peterson making threatening moves with his hands by "digging into his waistband or pocket" and Officer Adams observed Peterson's "elbow pumping up and down like he's trying to grab -- get a hold of something in that area."

41.     Officer Adams identified several indicators that concerned him as the interaction with Peterson began:

> [Peterson pumping his arm]'s happening just prior to him beginning his flight or his run. So it's happening as I'm getting out of the car. You can't see it on the video. Well, you can kind of see the end -- I think you can see the bare end of it as his elbow comes down.
>
> But that's the first, like, clue on scene that he is, in fact, going to pose a threat as opposed to  [reports  from  another  officer]  -- because I had them both in my head. I had here's a guy I'm begin told that is making threats towards cops, carrying a gun up in Jordan Landing. I'm also begin told that, you know, he's a pretty decent dude, didn't pose, you know, any kind of problems the couple times [another officer] ran into him.
>
> So now here I am coming into this situation. He's lying to me and he's not stopping and now he's digging into his waistband. That's leaning back towards the, okay, we're in -- you know, about to get into a lethal threat territory here. So that's what -- how I would describe the arm pumping.

42.     Peterson testified that as he began running, he dropped the beer that he was carrying and, when the cardboard sheath over the butcher knife he was carrying began to poke him in the leg, he reached into this pocket, removed the knife, and threw it over the fence.

43.     After throwing the knife, Peterson recalls Officer Adams stating "he threw a gun" and continued running.

44.     In explaining why he ran, Peterson testified that he expected the officer to "go over and grab my friend."

**Review of body camera video with input from witnesses.**

45.     Officer Adams was shown the video from his body camera taken during his interactions with Peterson. The body camera was not turned on until following the incident, but is designed to record video for thirty seconds prior to the time it is turned on. Audio begins at the time the body camera is turned on. The entire interaction lasted approximately 16 seconds.

46.     When Officer Adams exited his patrol car, Officer Adams instructed Peterson to stop. Peterson continued walking away.

47.     Peterson disputes that Officer Adams directed Peterson to stop.

48.     Instead of stopping, as directed by Officer Adams, Peterson began to run and Officer Adams pursued Peterson.

49.     As Peterson was running, Peterson turns his torso back towards Officer Adams while digging into his waistband, creating distance between Peterson and Officer Adams in a manner indicating to Officer Adams that Peterson is preparing an assault from a position that Officer Adams in unable to respond.

11

50.     During the pursuit, the body cam video shows Peterson dropping an object. Officer Adams recalled observing some movement but during the course of the incident was unable to confirm whether Peterson had dropped an object.

51.     Officer Adams drew his firearm during the pursuit because he believed that he was in imminent threat of death or bodily harm due to Peterson's actions while evading Officer Adams.

52.     Officer Adams lowered his firearm during the pursuit to confirm whether Peterson had a weapon or was making movements indicative of threatening imminent bodily harm or death, including Peterson's continued running to create distance.

53.     As Peterson was running, Officer Adams observed Peterson twisting back around in what was believed to be an effort to draw a weapon from Peterson's waistband where Officer Adams was aware guns are typically carried.

54.     Officer Adams discharged his firearm towards Peterson and was later informed Officer Adams discharged ten rounds.

55.     Peterson was shot with two rounds from Officer Adams' firearm – one in the buttock and the other in the hip.

56.     Officer Adams described his perceptions at the time of discharging his firearm that "I perceived that he had produced a -- or was digging for and producing a handgun from his waistband, turning back towards me, targeting me, and that I was about to die."

57.     Officer Adams further testified that his concerns that Peterson was drawing a gun were affected by his prior awareness of Peterson's threats and actions.

[Peterson's] Facebook comments that he had a gun. His arm pumping motion in that same area just prior to beginning his run. The fact that he was creating distance but turning back around towards me that's not typical in a – somebody who is running to get away from me. He's turning back. He's twisting his torso back around to look at me. If he wants to get away, he should be running dead -- dead set ahead. That's what people do trying to get away from me in my experience.

He's reaching into his waistband. He's pulling out a silver object. It's flashing silver, red. Silver, red. He's about to kill me or try to kill me.

58.     Officer Adams' post-incident interviews confirmed his recollections of fearing

imminent bodily harm or death and documented his perceptions.

I said, "Stop. Police, stop," and he began running. I got out the traffic 192 foot pursuit. Probably not that calm, but that was the words. As I tried to get out my location, you know, "192 foot pursuit," and I'm trying to catch up, he's ma -- he's faster than me, he throws something to his left. Well, he drops the grocery bag out of his left hand. He drops that and then he throw -- suddenly throws something that looked like a weapon to his left and that interrupted my ability to get out the location.

He then -- the foot pursuit's still going on and this is all happening very, very fast. He then turns to me, looks, makes eye contact with me and begins to draw a handgun from his side or back area, right here. I screamed, "Gun, gun," very, very loudly. We're going east towards the foot bridge.

As he drew it, I saw it flash -- and this was very confusing for me, but it flashed – like, the whole -- it -- it was a silver object, then it was a red object, then it was a silver object, then it was a red object, then a silver object. It was just red, silver, red, silver.

I knew at that point, as he drew the handgun and locked on me with his eyes, that he was about to kill me or try to kill me. I began shooting with my gun to stop him from killing me or trying to kill me with that handgun. I saw him fall shortly after and I stopped shooting. I believed he was dead at that point, and I turned and

13

went to go find the other suspect, so… Everything else is on the
video.

**Peterson's arrest, incarceration and trial.**

59.     Officer Greg Gray responded to the scene of the shooting and checked Peterson's

status and searched Peterson. During the course of the search Officer Gray located the bent piece

of metal with duct tape around it and separate from the laser pointer in Peterson's back pocket.

60.     Officer Gray located the letter opener and scissors lying next to Peterson at the

scene, as well as the butcher's knife farther away from where Peterson was located.

61.     Officer Gray also provided medical assistance and checked the status of

Peterson's injuries.

62.     An ambulance arrived to transport Peterson within two or three minutes of Officer

Gray's arrival at the scene.

63.     While Peterson was at the scene and waiting for medical transportation, Peterson

recalls the officers mentioning that the laser pointer that he had attached to the bent piece of

metal was on following the incident. Peterson denied that the laser was on prior to the incident.

64.     Peterson was transported to IMC following the shooting and was treated for two

gunshot wounds in his hip and buttock.

65.     Peterson was arrested and charged by the Salt Lake County Attorney's Office with

Assault Against a Police Officer; Purchase, Transfer, Possession or Use of a Dangerous Weapon

by Restricted Person; Fail to Stop at Command of Law Officer.

66.     Following treatment at IMC, Peterson was incarcerated in the Salt Lake County

Jail.

67.     Following a preliminary hearing on November 17, 2014, the district court found sufficient evidence to bind Peterson over for trial.

68.     Due to various extensions, as requested by both Peterson and the prosecution, Peterson's trial for the charges identified herein took place in February 2016.

69.     At the time of trial, the Salt Lake County District Attorney elected to proceed on the single charge of assault on a police officer.

70.     The jury found Peterson not guilty of the charge of assault on a police officer.

**Officer Adams' actions were reviewed by West Jordan Police Department and Salt Lake District Attorney's Office and found justified.**

71.     On July 10, 2014, Sergeant James Bigelow of the West Jordan Police Department was immediately assigned to investigate whether the actions of Officer Adams violated any laws.

72.     The Salt Lake County District Attorney's Office was also involved in order to investigate whether the actions of Officer Adams violated any laws.

73.     The Salt Lake County District Attorney's Office issued a letter following its review of Officer Adams' actions related to Peterson as justified.

**Peterson's actions while this lawsuit has been pending.**

74.     During the pendency of this litigation and prior to the close of fact discovery, Peterson was charged on several counts of domestic violence from events occurring on September 30, 2017. The charges include (1) aggravated kidnapping, (2) aggravated assault, (3) mayhem, and (4) failure to stop at command of law officer.

75.     Peterson was convicted of (1) aggravated kidnapping, (2) aggravated assault, and (3) failure to stop at command of law officer on February 12, 2018. Peterson is scheduled to appear for sentencing on March 22, 2018.

15

**Peterson's Complaint.**

76.     The Plaintiff filed his Original Complaint[9] on July 11, 2016 against, among others, Officer Adams, Chief Diamond, the City, Salt Lake City Corporation,[10] the County and Sheriff Winder, for an incident which occurred on July 10, 2014 when Peterson was shot by Officer Adams and after which Peterson was placed under arrest, detained, prosecuted, and acquitted of assault on a police officer.

77.     The Plaintiff has alleged in Count 1 that on July 10, 2014, Officer Adams dangerously and improperly discharged his firearm, used excessive force against him, failed to use less dangerous means of restraint before shooting Peterson and failed to follow proper police procedures.

78.     The Plaintiff has alleged in Count 1 that Officer Adams' actions were unreasonable, excessive and undertaken with malice, willfulness and reckless indifference.

79.     The Plaintiff alleged in Count 3 that Officer Adams and the City, with malice, willfulness, and/or reckless indifference to Plaintiff's rights, "created a false and/or inaccurate police reports, and falsely charged Plaintiff with assault against a peace officers (second degree felony); purchase, transfer, use of a dangerous weapon by a restricted person (class A misdemeanor), and failure to stop at command of law officer (class A misdemeanor)"

---

[9] The First Amended Complaint was filed on June 2, 2017, and added, among other things a claim for Malicious Prosecution against the County.

[10] Salt Lake City Corporation was dismissed by stipulation of the parties on September 13, 2016. *See* docket no. 30.

80.     The Plaintiff alleged in Count 4 that Officer Adams and the City "deprived Plaintiff of his rights, privileges and immunities secured by the First, Fourth, and Fourteenth Amendments of the Constitution of the United States, including the right to be free from unreasonable and unlawful arrest, imprisonment, seizure and detention of his person."

81.     The Plaintiff alleged in Count 4 that he was arrested and/or detained against his will without proper legal authority, legal justification or probable cause.

**Facts Related to Plaintiff's Medical Care at IMC.**

82.     After the Shooting Incident, Peterson was transported by ambulance to IMC arriving at approximately 1:00 AM on July 10, 2014. By the time he was being transported by ambulance his bleeding was controlled and the ambulance did not travel with lights or sirens.

83.     After Peterson was assessed by the trauma team at IMC, he was taken for a CT scan of his abdomen and pelvis. His CT scan was conducted at approximately 1:25 AM— roughly 25 minutes after he arrived at IMC. The CT scan showed:

> There is a comminuted fracture of the left posterior acetabulum, not significantly displaced. Main bullet fragment is adjacent to the posterior superior acetabulum. Left hip joint normally aligned, but there is gas within the joint space. There is no appreciable hematoma, pseudoaneurysm, vascular extravasation.

84.     Shortly thereafter—at 2:42 AM—Peterson's pelvis was x-rayed. Consistent with his CT scan, his x-rays showed a "[l]eft ischial fracture related to gunshot wound with bullet fragments and soft tissue gas around the left hip."

85.     The following morning, Peterson had a consultation with an IMC orthopedic surgeon named Peter Larcom. Dr. Larcom conducted a clinical examination of Peterson and reviewed his x-rays and CT scan. His impression was that Peterson was "a good candidate for

conservative measures," that the bullet did not need to be removed, and that his "ischial fracture will be treated nonoperatively." Dr. Larcom's impressions and recommended course of treatment were discussed with Peterson and any questions were answered.

86.　　Peterson's IMC discharge summary notes that his fracture was deemed nonoperative, he was being treated with oral pain medication, he was taking preventative antibiotics, that he was in stable condition and able to safely ambulate with assistance, and that the "erythema and fluid retention in his wounds had resolved." His discharge instructions were for admission to the "jail infirmary," dressing changes twice daily, observation for infection, to follow up with Dr. Larcom, weight bearing and activity as tolerated, and to engage in physical therapy "at the jail if available for further strength training."

87.　　Peterson was discharged to police officers at 3:50 p.m.　on July 14, 2014.

**Facts Related to Plaintiff's Medical Care upon First Arriving at the Jail.**

88.　　Upon arriving at the Jail, Peterson received a "Nursing Pre-Screen Examination" that included a review of his medical history (including an assessment of current medications and medical problems), a physical examination (including assessments of his appearance, level of consciousness, orientation, behavior, motor skills, and vital signs), a mental health assessment, and a substance abuse assessment. That assessment occurred on July 14, 2014 at 4:08 p.m.

89.　　Later that night, at 9:29 p.m. Dr. Michael B. Strong entered an "Encounter Order" admitting Peterson to Acute Medical. The Jail's Acute Medical Unit is an inpatient medical facility housed in the Jail that is designed to provide 24-hour hospital-type care for inmates.

90.     At 11:00 p.m. on July 14, 2014, Peterson was assessed by Dr. Strong utilizing the Wellcon Opiate Withdrawal Scale, which assesses, among other things, vital signs, sweating, and bone and joint aches.

91.     Finally, at 11:40 p.m. on July 14, 2014, Peterson received a full Acute Medical Patient Assessment by a registered nurse. That exam involved an assessment of, among other things, neurologic, cardiovascular, respiratory, gastrointestinal, and musculoskeletal conditions. It also involves a wound assessment.

**Facts Related to Plaintiff's Medical Care in the Jail's Acute Medical Unit.**

92.     After being admitted to the Acute Medical Unit on July 14, 2014, Peterson spent an additional 10 days there being monitored in a hospital-type setting. There is medical documentation, in the form of doctor's notes and nurse progress reports that show he was seen by medical professionals no less than 15 times while in the Acute Medical Unit.

93.     His Acute Medical Unit Discharge Summary—dated July 24, 2014— indicates he was requesting that he be discharged to general population. The discharge plan indicates that Peterson would continue to have dressing changes and be prescribed pain medication for two weeks—until August 6, 2014—and be scheduled for a follow up doctor's appointment in 12 days.

**Facts Related to Plaintiff's Medical Care after His Discharge from the Acute Medical Unit**

94.     Between July 25, 2014 and July 29, 2014, Peterson continued to allow the Jail nurses to change his wound dressings. However, starting on July 30, 2014 and continuing on August 2, 2014, Peterson began refusing to allow the jail nurses to change his dressings or look

at his wound site. On each of those occasions, he was administered sufficient supplies so he could change his dressings himself.

95.     On August 3, 2014, Peterson submitted a Sick Call Request asking if he could be issued crutches and placed in a cell on the first tier of the Jail so he did not have to navigate stairs. In response to his Sick Call Request, Peterson was seen by a medical doctor on August 5, 2014, where he was issued crutches, and authorized to be placed on the bottom bunk on the bottom tier of the Jail. At Peterson's August 5, 2014 appointment, he was also given a general follow up assessment of his hip injury and gunshot wounds. It was noted that two of his gunshot wounds were "well-healed" and that the exit wound was "healing well."

96.     On August 8, 2014, Peterson submitted two Sick Call Requests. The first request stated that he fell while at court and would like to see a doctor about his hip and back pain. His second request asked about getting pain medication. In response to these sick call requests, Peterson saw a doctor the same day—August 8, 2014—who ordered x-rays that were also taken the same day. The x-rays showed that "[t]here is not fracture of dislocation" and that "[n]o facture [was] seen." A nurse responded to Peterson's request about narcotic pain medication the same day—August 8, 2014—informing him that there was no doctor's note in his chart allowing continued pain medication. The nurse's response is consistent with Peterson's Acute Medical Unit Discharge Summary that stated he would continue on pain medication for two weeks—until August 6, 2014.

97.     On August 9, 2014, Peterson submitted another Sick Call Request asking for narcotic pain medication. A nurse responded the same day that the doctor had not ordered additional pain medication.

20

98.     On August 11, 2014, Peterson received another set of standard follow up x-rays that again found no fracture in his hip.

99.     On August 14, 2014, Peterson submitted a Sick Call Request stating that he was having pain in his left hip, trouble bearing weight on his left leg, and requesting a transfer back to the Acute Medical Unit. A nurse assessed Peterson and cleared him to use a wheelchair for appointments and scheduled him to see a doctor the next day.

100.     On August 16, 2014, Peterson submitted a Sick Call Request requesting a transfer to the Acute Medical Unit, the use of a wheelchair for court and visitation, and an appointment with a "specialist." The responding nurse approved his request to use a wheelchair for court and visitation. She referred the other matters to a doctor. Peterson was seen by a doctor two days later on August 18, 2014 to address his concerns. The doctor noted that Peterson was doing fine up until "a few days ago when he noticed an increase in pain and a decrease in his ability to use his leg." *Id.* The doctor noted that his gunshot wounds were well healed and there was no sign of a deep-seated infection that would be causing pain. The doctor determined the best course of action would be to take another set of x-rays to determine if there had been any changes since August 11, 2014, because his symptoms had changed. Two sets of x-rays were ordered the same day and were taken the following day—August 19, 2014. The x-rays showed no fractures in his hip or femur. Peterson then had a follow up appointment with the doctor on August 20, 2014 to review the x-rays. The records of Peterson's August 20, 2014 doctor's appointment indicate that he visually reviewed the x-rays with the doctor and that there was no change in the location of the bullet or condition of his hip. Thus, the doctor concluded that "this is really just a wait and watch issue as I do not find any evidence of any significant problems that need additional

workup presently." In addition, the Jail scheduled an appointment for Peterson to see the orthopedic surgeon that treated him at IMC on September 8, 2014. However, on the day of the appointment Peterson refused to go with the Jail's transport team to the appointment.

101.    On August 22, 2014 Peterson submitted a Sick Call Request requesting personal shoes because he believed they would help with pain. He was seen by a doctor concerning his request on August 30, 2014.

102.    Peterson was seen by a doctor on September 5, 2014, as a follow-up appointment regarding his hip and gunshot wounds. Peterson requested he be taken off all medication, which the doctor endorsed. There is no record this visit was requested through a Sick Call Request.

103.    On September 6, 2014, Peterson submitted a Sick Call Request asking the nurses to stop bringing him medication that the doctors approved him to stop taking. The nurse confirmed his request the following day.

104.    On September 20, 2014, Peterson submitted a Sick Call Request stating that he felt something pop in his hip when he was getting up after a guard told him he had to sit down. A nurse examined him noting that he had a stable gait and sufficient "ROM"—range of motion.

105.    On October 15, 2014, Peterson was seen by a doctor regarding complaints that he was not receiving the care he needed with respect to physical therapy. The doctor examined Peterson, who acknowledged his gait was improving, and assessed the stability of his gait and various ranges of motion. The doctor concluded that "[r]egarding the patient's need for outside physical therapy, he appears to have adequate function for his activities of daily living while incarcerated. He is able to ambulate and move his joint without significant problems. At this time

it does not appear to be medically necessary for physical therapy on the outside." He provided Peterson with exercises he could perform in his cell.

106.     On February 4, 2015, Peterson submitted a Sick Call Request stating that he was having pain in his "hip, butt, thigh, calf, ankle, and foot" from the gunshot wound to his hip and that it was giving him "Charlie horses" and beginning to interfere with his sleep. He was assessed by a nurse on February 8, 2015 who noted chronic pain from his injury and scheduled him to see a doctor. Peterson saw a doctor for his concerns on February 18, 2015. After examining Peterson and discussing his instructions for physical therapy exercises, the doctor encouraged continued use of the physical therapy exercises and prescribed him Tylenol for his pain. Peterson refused the Tylenol on February 19 and February 20.

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, the court reviews the facts in a light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor.  *See Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

Moreover, because Plaintiff failed to respond to the motions, the court may grant them without further notice. DUCivR 56-1. However, the court must still determine whether the defendants are entitled to judgment as a matter of law. *See id.* ("Failure to respond timely to a motion for summary judgment may result in the court's granting the motion without further

notice, provided the moving party has established that it is entitled to judgment as a matter of law.").

I.      **Officer Adams' Motion for Summary Judgment**

Officer Adams argues he is entitled to summary judgment because (1) he is entitled to qualified immunity on Peterson's excessive force claims; (2) the district court found that there was sufficient evidence to bind Peterson over on the charges for which he was arrested, and therefore, as a matter of law, Peterson cannot prevail on his malicious prosecution charges; and (3) Peterson cannot prevail as a matter of law on his false arrest claim because there were valid warrants out for his arrest.

a.   Excessive Force

Peterson asserts that Officer Adams violated his Fourth Amendment right to be free from excessive force. Officer Adams asserts the defense of qualified immunity. "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City and Cnty. Of San Fransisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (internal quotation and citation omitted). "[T]he clearly established law must be particularized to the facts of the case." *Id.* (internal quotation and citation omitted). "Qualified immunity gives governmental officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

24

When a defendant raises the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff to demonstrate both (1) that the defendant's actions violated a specific constitutional right, and (2) that the infringed right at issue was clearly established at the time of the alleged unlawful activity such that "every reasonable official would have understood that what he [was] doing" violated the law. *Id.* at 741. The court has discretion to analyze the two prongs of qualified immunity in either order based on the circumstances of the particular case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

### i.   *Officer Adams' Use of Force Was Objectively Reasonable*

Where the material facts are not in dispute, the legal reasonableness of the officer's use of force is a question of law. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (providing that "[t]he objective legal reasonableness of the officer's actions is a legal question" unless there are disputed material facts). The court concludes Officer Adams actions were objectively reasonable under the circumstances and did not violate Peterson's Fourth Amendment right to be free from excessive force. Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard, judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Conner*, 490 U.S. 386, 396 (1989).  Although there is no set format, factors to consider include: "the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest." *Mecham v. Frazier*, 500 F.3d 1200, 1204

(10th Cir. 2007) (citations omitted).  The use of deadly force is not constitutionally unreasonable where the officer has probable cause to believe the suspect poses a threat of death or serious physical harm to the officer or to others. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

In assessing the degree of threat facing an officer in deadly force cases, the Tenth Circuit has set forth the following non-exclusive factors to be considered: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2009).

Defendants admit that there is some dispute as to what command Officer Adams gave to Peterson.[11] However, in applying the other three *Estate of Larson* factors, the undisputed facts weigh heavily in favor of a finding that Officer Adams' use of force was objectively reasonable. *See Estate of Larsen*, 511 F.3d at 1262 (holding that, where there was a factual dispute as to the distance between the officer and plaintiff, "the question of distance is unpersuasive when we consider the other undisputed facts in their totality").

First, hostile motions were made with the weapons Peterson admittedly had in his pockets. It is undisputed that while fleeing on foot from Officer Adams, Peterson was making "pumping" motions with his arms in the area of his waistband, where he admittedly had weapons. Second, the undisputed facts establish that when Officer Adams first approached Peterson, only six to eight feet separated them, and that during Officer Adams' pursuit of

---

[11] *See* docket nos. 105 and 111 at ¶ 47 ("Peterson disputes that Officer Adams directed Peterson to stop.").

Peterson, he was close enough to shoot him. Finally, Peterson's actions during the Shooting

Incident as well as prior threats in social media posts, demonstrated his manifest intention to

cause serious physical or deadly harm to officers. It is undisputed that Peterson had made threats

on social media to shoot police officers and asserted in those posts that he was armed with a gun.

It is undisputed that while running from Officer Adams, Peterson twisted back towards him and

that Officer Adams saw a flash of metal which he believed to be a gun. Based on the foregoing,

the court concludes that Officer Adams' use of deadly force was objectively reasonable under the

circumstances and did not violate Peterson's Fourth Amendment rights.

ii.  *The Unlawfulness of Officer Adams' Actions Not Clearly Established*

Moreover, the unlawfulness of Officer Adams actions under these circumstances was not

clearly established and therefore Officer Adams is entitled to qualified immunity. "Ordinarily, in

order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit

decision on point, or the clearly established weight of authority from other courts must have

found the law to be as the plaintiff maintains." *Currier v. Doran,* 242 F.3d 905, 923 (10th Cir.

2001). "While a case directly on point is not required, the Supreme Court has held that 'existing

precedent must have placed the statutory or constitutional question beyond debate.'" *Tapia v.

City of Albuquerque*, 10 F. Supp. 3d 1207, 1270 (D.N.M. 2014) (quoting *al-Kidd,* 563 U.S. at

741).

Once Officer Adams raised the defense of qualified immunity, Peterson bore the burden

of showing that "every reasonable official would have understood" that Officer Adams' actions

under the particular circumstances violated the law. *See al-Kidd*, 563 U.S. at 743. Peterson did

not respond to Officer Adams motion, and has not identified a single case or statute that would

27

have put Officer Adams on such notice that shooting him under the particular circumstances of this case would be a violation of his right to be free from excessive force. Plaintiff has not met his burden to show that every reasonable officer would have known that the use of deadly force in the circumstances presented to Officer Adams was a violation of the Fourth Amendment. Accordingly, the court concludes that Officer Adams is entitled to qualified immunity on Peterson's excessive force claim.

        b.  <u>Malicious Prosecution</u>

        Officer Adams also raises a qualified immunity defense to Peterson's malicious prosecution claim, which requires the same analysis as addressed *supra.* Accordingly, the burden shifts to Peterson to show that (1) Officer Adams' actions violated a specific constitutional right, and (2) that the infringed right was clearly established such that "every reasonable official would have understood that what he [was] doing" violated the law. *al-Kidd*, 563 U.S. at 741 (citation omitted). "In [the Tenth Circuit], when addressing § 1983 malicious prosecution claims, [courts] use the common law elements of malicious prosecution as the 'starting point' of [the] analysis; however, the ultimate question is whether plaintiff has proven the deprivation of a constitutional right." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257 (10th Cir. 2007) (citing *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)). Those common elements are "(1) the defendant caused the plaintiff's confinement or prosecution; (2) the original action terminated in the plaintiff's favor; (3) there was no probable cause to confine or prosecute the plaintiff; (4) malice; and (5) damages." *Cordova v. City of Albuquerque*, 816 F.3d 645, 650 (10th Cir. 2016) (citing *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)).

Officer Adams argues, and the court agrees, that Peterson is unable to show that Officer Adams "caused" Peterson's confinement or prosecution. In a malicious prosecution case, "'the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor.'" *Taylor*, 82 F.3d at 1564 (quoting *Reed v. City of Chicago,* 77 F.3d 1049, 1053 (7th Cir.1996)). The Tenth Circuit has held that an adversarial proceeding – such as a preliminary hearing – "in which a judge independently listened to testimony, evaluated the credibility of those testifying, reviewed evidence, and concluded that the evidence [is] sufficient to bind" a defendant "over for trial" breaks the chain of causation. *Id.* Here, the undisputed facts demonstrate that a court held a preliminary hearing and determined that there was sufficient evidence to conduct a trial on the charges against Peterson. Accordingly, the court concludes that the chain of causation as to the claim of malicious prosecution against Officer Adams was broken, and he is entitled to summary judgment on that claim.

      c.  <u>False Arrest</u>

Finally, Officer Adams is entitled to summary judgment on Peterson's false arrest claim. The undisputed facts establish Peterson was the subject of several valid warrants at the time Officer Adams stopped Peterson. And, "[a] police officer who arrests someone with probable cause or a valid warrant is not liable for false arrest simply because the innocence of the suspect is later established." *Atkins v. Lanning*, 556 F.2d 485, 487 (10th Cir. 1977). Because there were valid warrants for Peterson's arrest, the court concludes that Officer Adams had probable cause to arrest Peterson, and his acquittal on the charges on which he was ultimately tried is irrelevant to that determination. *See Munday v. Johnson*, 257 F. App'x 126, 134 (10th Cir. 2007) (citing

*Atkins*, 556 F.2d at 487) (holding that an "arrestee's later-established innocence is not relevant to the probable cause determination"). Accordingly, the court concludes that Officer Adams is entitled to summary judgment on the false arrest claim against him.

## II. West Jordan Defendants' Motion for Summary Judgment

The West Jordan Defendants argue that they are entitled to summary judgment because (1) Officer Adams is entitled to qualified immunity for excessive force, and therefore the City cannot be found liable under 42 U.S.C. § 1983 for excessive force; (2) claims for malicious prosecution and false arrest fail as to Officer Adams, therefore those claims fail as against the City; and (3) because there was no constitutional violation by Officer Adams, a claim of inadequate training supervision, and policies cannot be made out against the City or Chief Diamond.

### a. Excessive Force, Malicious Prosecution, and False Arrest

Peterson alleges that Officer Adams was acting in the course and scope of his employment under color of state law, and that as a result the City is vicariously liable for Officer Adams if unreasonable force was used by Officer Adams under the circumstances. Because the court has concluded that Officer Adams is entitled to qualified immunity on Peterson's excessive force claim, the City also cannot be liable for excessive force. Similarly, because the court has determined that Officer Adams is entitled to summary judgment on Peterson's malicious prosecution and false arrest claims, the City cannot be held vicariously liable for those claims. Accordingly, the court recommends that summary judgment be entered in favor of the City on Peterson's claims of excessive force, malicious prosecution, and false arrest.

b. <u>Custom and Policy</u>

Peterson claims that the City and Chief Diamond "encouraged, developed, pursued, or permitted policies, practices, and customs either formal or informal, which caused and permitted police officers to use unreasonable and unnecessary force in apprehending people," and that Chief Diamond and the City "have knowingly and/or intentionally failed to adequately hire, retain, train, educate, monitor, and/or supervise, or ha[ve] been deliberately indifferent, reckless, or grossly negligent in hiring, retaining, training, educating, monitoring, and/or supervising its police officers."[12]

When a § 1983 claim is asserted against a municipality, the court must analyze two separate issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). "A claim of inadequate training, supervision, and policies under § 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation by the person supervised." *Webber v. Mefford*, 43 F.3d 1340, 1344–45 (10th Cir. 1994). Consequently, "if a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (emphasis in original). Because the court has already concluded that Officer Adams committed no constitutional violation, the court recommends that summary judgment be entered in favor of the City on Peterson's policy and custom claim. Moreover "[a] suit against a

---

[12] Docket no. 54 at ¶¶ 67, 69.

city official in his official capacity is no different from a suit against the [c]ity itself." *Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511, 1517 (10th Cir. 1995). Thus, Peterson's policy and custom claim against Chief Diamond fail for the same reasons it fails against the City, and the court recommends that summary judgment on this claim be entered in his favor.

### III.    County Defendants' Motion for Summary Judgment

Peterson asserts claims against the County and Sherriff Winder under 42 U.S.C. § 1983 for (1) violating his Eighth Amendment rights by failing to provide adequate medical care, (2) failure to provide adequate medical care – policy and custom, and (3) malicious prosecution. The County Defendants argue that they are entitled to summary judgment on these claims because (a) Peterson cannot establish the elements of his Eighth Amendment claims against any individual actor; (b) Peterson cannot as a matter of law establish the County Defendants have a custom and policy of being deliberately indifferent to inmates' medical needs; (c) Peterson cannot as a matter of law establish his malicious prosecution claim against the County Defendants; and, finally, (d) Sherriff Winder is not the appropriate party, in either his individual or official capacities and should be dismissed.

### a.    Failure to Provide Adequate Medical Care

The Complaint alleges that the County Defendants violated Peterson's Eighth Amendment rights by failing to "provide timely medical treatment for medical conditions about which they knew or should have known."[13] To establish a claim for failure to provide adequate medical care under the Eighth Amendment, Peterson must prove that a named defendant was

---

[13] Docket no. 54 at ¶¶ 86, 88.

"deliberate[ly] indifferen[t] to his serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This standard has an objective component and a subjective component, both of which must be satisfied to successfully maintain the claim. *See Garrett v. Stratman*, 254 F.3d 946, 949 (10th Cir. 2001). To satisfy the objective component, "[t]he medical need must be sufficiently serious." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). The Tenth Circuit has "held that a medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980)). To satisfy "the subjective component, i.e., the requisite deliberate indifference, a plaintiff must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Here, the County Defendants do not dispute that Peterson's gunshot wounds and nonoperative bone fracture were "sufficiently serious" when he first arrived at the Jail. However, the undisputed facts show that those injuries were treated, and that by August 8, 2014, those injuries had healed.

Moreover, the court concludes that Peterson cannot establish the necessary subjective component of his deliberate indifference claim. That component requires a showing that a prison official actually "kn[ew] and disregard[ed] an excessive risk to an inmate['s] health or safety. *Farmer*, 511 U.S. at 837. The subjective component requires the court to analyze a particular official's state of mind. Here, however, Peterson did not name a single Jail official or medical professional as a defendant in the Complaint. The fact that he named several John and Jane Does

does not save his claim at this stage of the litigation where discovery has closed. Once discovery

closes, a plaintiff asserting an Eighth Amendment violation is required to name the specific

individual that allegedly violated their rights. Peterson cannot defeat summary judgment by

relying on the naming of a John or Jane Doe defendant. *Boyett v. Cty. of Washington*, 282 F.

App'x 667, 681 (10th Cir. 2008) ("At the summary judgment stage, Plaintiffs must point to facts

that show a particular Defendant caused the injuries with a culpable state of mind."). Because

discovery has closed, and Peterson has not named a defendant who allegedly acted with

deliberate indifference to his medical needs, he cannot satisfy the subjective component and his

claim fails as a matter of law.[14]

> b.  <u>Custom and Policy</u>

Peterson also seeks to hold the County liable for the alleged deliberate indifference

committed by its agents or officers. Because the court has concluded that Peterson cannot

establish a deliberate indifference claim against any individual actor, the County cannot be held

liable as a matter of law. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993)

("A municipality may not be held liable where there was no underlying constitutional violation

---

[14] In addition, the court notes that because Peterson did not respond to the County Defendants'
motion for summary judgment, he has not met his burden to "present evidence in order to defeat
a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S.
242, 257 (1986). Here, the County Defendants have supported their motion with medical records
showing that Peterson received prompt and thorough medical attention, and that his doctors
ordered treatment consistent with his symptoms and continued to monitor his condition. *See Self
v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006) (holding that a finding of deliberate
indifference is unwarranted when a doctor "orders treatment consistent with the symptoms
presented and then continues to monitor the patient's condition").

by any of its officers."). Accordingly, the County is entitled to summary judgment on Peterson's cause of action for custom and policy of deliberate indifference.

        c.  <u>Malicious Prosecution.</u>

Finally, Peterson brings a claim for malicious prosecution against the County Defendants. For the same reasons that Peterson's claim of malicious prosecution against Officer Adams and the West Jordan Defendants fails, it also fails as against the County Defendants. Because a court determined that there was probable cause for the District Attorney's Office to pursue charges against Peterson, the chain of causation for malicious prosecution was broken and this claim against the County Defendants fails as a matter of law. *See Taylor*, 82 F.3d at 1564.

        d.  <u>Sheriff Winder</u>

Peterson names Sheriff Winder both in his individual and official capacity in the Complaint. First, when a government official is named in a lawsuit in their official capacity, it is another way of naming the government itself, and claims against the individual in their official capacity are subject to dismissal on the same grounds as a claim against the government itself. *See Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 695 (10th Cir. 1988) ("A [§ 1983] suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same."). Because, as discussed above, Peterson cannot maintain any of his claims against the County, Sheriff Winder in his official capacity is entitled to summary judgment on those same claims. Second, Peterson brings a claim of malicious prosecution against Sheriff Winder in his individual capacity. For the same reasons that Officer Adams is entitled to qualified immunity on this claim, so is Sheriff Winder entitled to qualified immunity. Accordingly, the court

concludes that summary judgment should be entered in favor of Sherriff Winder as to all claims against him in both his official and individual capacities.

## CONCLUSION

For all the foregoing reasons, the **IT IS HEREBY RECOMMENDED** that:

1. Officer Adams motion for summary judgment[15] be **GRANTED**;

2. West Jordan Defendants' motion for summary judgment[16] be **GRANTED**; and,

3. County Defendants' motion for summary judgment[17] be **GRANTED.**

Copies of this Report and Recommendation are being sent to all parties, who are hereby notified of their right to object. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The parties must file any objection to this Report and Recommendation within fourteen (14) days after being served with a copy of it. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to object may constitute waiver of objections upon subsequent review.

DATED this 7th day of September, 2018.

BY THE COURT:

PAUL M. WARNER
Chief United States Magistrate Judge

---

[15] *See* docket no. 111.

[16] *See* docket no. 105.

[17] *See* docket no. 108.